**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Don Lewis HART, Defendant-Appellee.**

No. 81–1002.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 13, 1981.

Decided Aug. 10, 1981.

---

Francis M. Wikstrom, Asst. U. S. Atty., Salt Lake City, Utah (Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, with him on the brief), for plaintiff-appellant.

Stephen R. McCaughey, Salt Lake City, Utah, on the brief, for defendant-appellee.

Before HOLLOWAY and McWILLIAMS, Circuit Judges, and BOHANON,* District Judge.

McWILLIAMS, Circuit Judge.

In a thirteen-count indictment, Don Lewis Hart was charged in eleven counts with the unlawful interstate transportation of firearms in violation of 18 U.S.C. §§ 922(g) and 924(a) (1976 and Supp. III 1979). In the two remaining counts, Hart was charged with crimes relating to the unlawful possession of a .45 caliber machine gun in violation of 26 U.S.C. §§ 5861 and 5871 (1976). All of the weapons were taken by the arresting officers in a warrantless search of Hart's Winnebago camper.

Soon after the return of the indictment, Hart filed a motion to suppress the use at trial of the weapons taken in the search of his camper. Hart's position was that the officers not only did not have a search warrant but that they did not have probable cause to search his camper and that he did not consent to any search. The trial court held an evidentiary hearing on the motion to suppress, and then granted the motion. The Government appeals, pursuant to 18 U.S.C. § 3731 (1976).

The basis for the trial court's ruling was that the search of the camper was preceded by an unlawful stop of Hart's vehicle and that the ensuing search and seizure of the guns was therefore unlawful under the fruit of the poisonous tree doctrine. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Having ruled that the unlawful stop tainted the seizure of the weapons, the trial court found it unnecessary to determine whether Hart consented to the search.[1]

The story begins on August 25, 1980, when a deputy sheriff for Utah County, Utah, received a telephone call from the Canyon County, Idaho, Sheriff's Office regarding a federal fugitive named Jones. The Idaho deputy stated that an unnamed woman informant had provided information that Jones was then living at a remote mining camp in the Utah desert. The informant had reportedly been present at the camp a few days earlier. The Idaho deputy told the Utah deputy that the informant also stated that, in addition to Jones, a "Dr. Hart" lived at the camp and that he was holding a woman, named Selma Hernandez,

---

* Honorable Luther L. Bohanon, United States District Judge for the Eastern, Northern and Western Districts of Oklahoma, sitting by designation.

1. The arresting officers testified that Hart was most cooperative and had not only given his consent to search the vehicle, but had indeed assisted the officers. Hart, however, testified that he wasn't even asked to give his consent.

against her will at the campsite. According to the informant, Hart was heavily armed and kept a machine gun in his camper.

The Idaho deputy provided only sketchy directions as to the location of the camp. Later, on the same day that they received the information, Utah County deputies tried to locate the mining camp where Jones and Hart supposedly lived, but were unsuccessful. The following day they tried to locate the camp in an air search, but were still unable to find it.

The Utah authorities were later given more detailed information as to the location of the camp. As a result, they searched again, and on August 27, 1980, they located the campsite. No one was at the camp, however, and they returned to their Provo office.

On August 28, 1980, the local Utah authorities joined forces with the FBI and returned to the campsite. Again, it was deserted. Shortly thereafter, however, they stopped a man entering the camp area. This person was Jones' father-in-law. He told the authorities that Hart and Selma Hernandez had gone into town in Hart's camper and should be returning shortly. Later that day Jones was arrested as he approached the camp.

After arresting Jones, the deputies left the campsite to return to Provo. On the way, they stopped at a small country store to get a soft drink. While at this store they observed a camper, which matched the description of Hart's vehicle, go by in the direction of the camp. At about this time Jones' father-in-law pulled into the parking area at the store and confirmed the description of the camper just seen by the authorities as matching Hart's vehicle. At this point the deputies determined to stop the camper and make inquiry about the woman who reportedly was being held against her will. They also wanted to check out the informant's statement that Hart had a machine gun.

The deputies caught up with Hart's camper and by use of their flashing red light succeeded in stopping the camper without incident. After checking Hart's driver's license and registration papers, a deputy advised Hart that they had information that Hart was holding his woman companion against her will and that he had certain firearms inside the camper. According to the officers, Hart was polite and cooperative and allowed them to question the woman outside the presence of Hart. It developed that the woman was *not* being held against her will. Then, according to the officers, Hart gave his consent to have the camper searched, and the search disclosed the twelve weapons which formed the basis for the present prosecution. After seizing the weapons, the deputies arrested Hart.

As mentioned, Hart's motion to suppress was based on an absence of probable cause, and lack of consent. By the time the evidentiary hearing on the motion to suppress was concluded, however, the matter was in a different posture. The trial judge held that not only did the deputies have probable cause to search the vehicle, but that they had probable cause for several days before and, therefore, had ample time to obtain a search warrant. Since there were no exigent circumstances, the deputies should have obtained a warrant, and failure to do so made the stop unlawful, reasoned the trial judge.[2] Having determined that the stop was unlawful, the trial judge deemed it unnecessary to decide whether Hart gave his consent to the search, since the unlawful stop tainted all that occurred afterwards.

2. We note that the trial court actually made two rulings on the suppression motion. There was a ruling from the bench at the close of the hearing and, about three weeks later, a written opinion was filed. At the close of the hearing, the court noted that Hart's camper was a "perambulating home" entitled to the Fourth Amendment protection requiring that any search and seizure be based upon probable cause. Further, the trial judge stated that he was inclined to grant the motion primarily because the information upon which the deputies based their search had been available for three days.

In the written opinion, the court reasoned that "when prior knowledge of criminal activity is possessed by officers several days in advance ... authority to make an investigatory stop is not present." Additionally, apparently referring to the fact that the deputies had noticed

Alternatively, the trial judge held that the stop of the camper was pretextual. In this regard, certain of the deputies did testify that the tail lights and license plates on Hart's camper were dust-covered, but there is nothing in the record to support the holding that this was a pretextual stop. The deputies decided to stop Hart's camper before they were within eyeshot of the license plates and would have stopped the camper even if the license plates had been spick-and-span. Since the trial judge's finding of a pretextual stop finds no support in the record, it is clearly erroneous. Furthermore, since we do not agree with the trial judge's holding that the initial stop was unlawful because the deputies had not obtained a search warrant, we reverse.

■ A law enforcement officer is not required to have probable cause to make an investigatory stop of a vehicle. Such a stop is lawful if the officer has "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). *See also Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the Supreme Court set forth the general rules controlling investigatory stops based on less than probable cause.

■ If we understand the trial judge's suppression order, the judge not only agreed that the officers had sufficient "articulable reasons" to believe that Hart was engaged in some sort of criminal activity as would justify a stop, but that in reality the officers had probable cause to search the camper. As indicated, the trial judge reasoned that there were no exigent circumstances, however, because the deputies should have obtained a search warrant at least a day or two before the camper was observed driving by the general store where they had stopped. In other words, the trial judge was of the view that when police officers have probable cause to search a vehicle, they must immediately obtain a

search warrant, and may not delay, and then rely on some subsequent exigency to justify a warrantless search. We do not agree with such reasoning.

At the outset, we note that we are concerned with what the Government contends was a lawful investigatory stop, followed by a consensual search of the vehicle, culminating in the arrest of the defendant, all without the benefit of any warrant. Many of the cases in this area involve a lawful arrest, based either on an arrest warrant or on an arrest based on probable cause, and an ensuing warrantless search of either a home, or place of business, or an automobile. Although we recognize that these cases involve slightly different facts than those in the present case, we think they nonetheless merit comment.

In *Trupiano v. United States*, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), the warrantless arrest of the defendant was held to be lawful since the defendant was observed committing a felony in the presence of the police officers. However, the ensuing search of defendant's premises was held to be invalid. The search was made without a search warrant, and the Supreme Court made much of the fact that the authorities had more than adequate time to secure a search warrant. The Supreme Court noted that no reason other than inconvenience and delay was given by the authorities for not having obtained a search warrant. The Supreme Court went on to hold that a search warrant must be secured "whenever reasonably practicable" for a search incident to an arrest. *Id.* at 705, 68 S.Ct. at 1232.

The Supreme Court in *United States v. Rabinowitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), upheld the warrantless search of a one-room place of business as being incident to a lawful arrest based on an arrest warrant. The Supreme Court in *Rabinowitz* overruled *Trupiano* to the extent that it required a search warrant solely on the basis that it was practical to do so,

that the camper's license plate was obscured by dust, the court held that, where a stop was merely a pretext "to search for evidence of criminality unrelated to the violation which re-

sulted in the stop," the evidence seized as a result of the pretextual stop cannot be admitted.

rather than upon the reasonableness of the search after a lawful arrest.[3]

In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 *rehearing denied*, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969), the Supreme Court held that a warrantless search of a home was not incident to the lawful arrest of the defendant, who was in his home when arrested. In so holding, the Supreme Court stated that *Rabinowitz*, and its precursor, *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, *rehearing denied*, 331 U.S. 867, 67 S.Ct. 1527, 91 L.Ed. 1871 (1947), "on their own facts, and insofar as the principles they stand for are inconsistent with those we have endorsed today ... are no longer to be followed." 395 U.S. at 768, 89 S.Ct. at 2042.

A case with perhaps greater pertinency is *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). A plurality of the Court in that case spoke as follows:

> Respondent contends that here ... probable cause to search the car existed for some time prior to arrest and that, therefore, there were no exigent circumstances. Assuming that probable cause previously existed, *we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment.* Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. ... The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action. *Id.* at 595–96, 94 S.Ct. at 2471–2472 (citation and footnote omitted) (emphasis added).

The defendants in *United States v. Whitfield*, 629 F.2d 136 (D.C.Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981), contested the warrantless search of a vehicle, arguing that the officers did not have probable cause, and alternatively, if they did have probable cause, they had adequate time to secure a search warrant. The court in *Whitfield* rejected both arguments. In rejecting the argument that the warrantless search should be declared invalid because the officers had time to obtain a warrant, the court stated that the police are not required to carry out a search of a motor vehicle "immediately upon the crystallization of probable cause."[4]

The Fifth Circuit in *United States v. Mitchell*, 538 F.2d 1230 (5th Cir. 1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792, *rehearing denied*, 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977), held that a search was proper where exigent circumstances justified the search of a truck without a warrant, even though the officers had ample time after probable cause had arisen to obtain a search warrant.

Application of the principles set forth in these cases leads us to conclude that the trial court erred in granting the defendant's

---

3. The *Rabinowitz* Court stated:

   To the extent that *Trupiano v. United States*, 334 U.S. 699, [68 S.Ct. 1229, 92 L.Ed. 1663] requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled. The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. 339 U.S. at 66, 70 S.Ct. at 435.

4. The *Whitfield* court first found that there was probable cause to search. Then the circuit discussed the appellants' contention that, even though there was probable cause, the search was invalid because the police had "ample time to obtain a warrant." The court declined to accept this argument, holding that "the mobility of a motor vehicle, without more, creates an exigency permitting a warrantless search based on probable cause." 629 F.2d at 140. The court stated that there is "only a limited expectation of privacy attached to motor vehicles" and that the only requirement in order to conduct a warrantless search is probable cause. *Id.* at 141 (footnote omitted).

   As in the instant case, the *Whitfield* defendants were charged with unlawful possession of firearms after previously being convicted of a felony. 629 F.2d at 138.

motion to suppress.[5] The deputies had ample reason to make an investigatory stop. They indeed had the required "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 101 S.Ct. at 695. Certainly exigent circumstances existed when Hart's camper passed by the officers. A few moments more and Hart and his camper would have been long gone. Under the circumstances, the officers would have been derelict in their duty had they not pursued and made their investigatory stop.

In sum, the trial court's holding that the stop of Hart's camper was unlawful is in error. In the present posture of this appeal, we are not called upon to determine whether Hart consented to the search of his camper. As indicated, that matter has not yet been resolved by the trial court.

Judgment reversed, and case remanded for further proceedings consonant with the views herein expressed.

---

5. In this Court counsel for Hart relies heavily on *Niro v. United States*, 388 F.2d 535 (1st Cir. 1968). We find that case unpersuasive.